Irving **KAZANOFF**, etc., Plaintiff,

v.

**UNITED STATES of America, et al., Defendants.**

No. CV–88–3098.

United States District Court,
E.D. New York.

Dec. 13, 1990.

---

Levine, Weinberg, Kaley & Pergament, Garden City, N.Y., for plaintiff.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., for defendant U.S.

Stephen A. Weinstein, New York City, for defendants Just Management and 100–10 67th Road Condominium Ass'n.

Harold M. Foster, New York City, for defendant Preferred 100–10 67th Road Condominium Corp.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This wrongful death suit is before the Court on motions for summary judgment by four of the defendants. Plaintiff, Irving Kazanoff, brings this tort action individually and as executor of the estate of his wife, Shelley Kazanoff, who was murdered in their apartment.

The second amended complaint alleges that defendants Daniel Rodriguez and William Deliu murdered Shelley Kazanoff in the course of robbing her and wrongfully caused her pain, injury, and death; that the United States ("the government") negligently caused her death because a U.S. Postal Service employee permitted Rodriguez and Deliu to enter the building as he was leaving; and that the following three defendants were negligent in failing to provide necessary security for the tenants: Just Management Corporation ("JMC"), the managing agent of the building; 100–10 67th Road Condominium Association ("Association"), the homeowners' association at the building; and Preferred 100–10 67th Road Condominium Corporation ("Preferred"), the owner of the unsold apartment units in the building, including plaintiff's. Each of these three defendants has asserted cross-claims against all of the other defendants in the case. Motions for summary judgment are now brought by all defendants, except the two individuals, on a variety of grounds.

The following facts are derived from depositions, documentary evidence, and the parties' 3(g) statements. They are not in dispute except where indicated.

On July 21, 1987, plaintiff and his wife lived in an apartment they rented at 100–10 67th Road in Forest Hills, New York. Plaintiff had resided in this residential sixty-four unit apartment building for 26 years, and with his decedent since 1980. The building has never employed a doorman.

Defendants Daniel Rodriguez and William Deliu agreed to rob Shelley Kazanoff in her apartment at 100–10 67th Road. According to Deliu, Rodriguez told him that he knew a woman whose husband owned a chain of fur stores and who had a lot of money, jewelry, and furs in her apartment. Shelley Kazanoff had known Rodriguez' mother for many years and had met him years earlier. Deliu states that Rodriguez intended to gain access to the building by obtaining a business card with Shelley Kazanoff's name written on it, carrying an attache case, and dressing in a manner to suggest that his presence at the building was for the purpose of transacting business with her.

On the morning of July 21, 1987, defendants Rodriguez and Deliu walked through the outer doorway of the building and entered the vestibule area at 100–10 67th Road. The vestibule contains two metal frame, self-closing, buzzer-activated glass doors leading into the lobby of the building and an intercom system by means of which tenants can communicate with visitors and open the locked doors to allow visitors into the building. Rodriguez and Deliu rang the buzzer in plaintiff's apartment through the intercom system, but no one answered. According to Deliu, Rodriguez then attempted to gain access to the lobby of the building with a plastic credit card but was unable to do so.

Charles Anderson, an employee of the United States Postal Service, had delivered mail to the building since February 1985. Access to the building by post office personnel is gained either by use of a key or the intercom-buzzer system that operates between each apartment and the lobby. Anderson regularly entered the building by using a key provided to the Postal Service. On July 21, 1987, he entered the building

with his key and delivered the mail. As he was exiting the lobby area, Rodriguez and Deliu entered the building by going in the open door as he·was coming out with his mail cart. ·According to Deliu, they had never discussed the regular arrival and departure of the postal carrier as a means of gaining access to the building but had assumed that Mrs. Kazanoff would let them in.

The superintendent of the building, Muhamed Dabovic, claims that he had told Anderson and his predecessors not to allow unauthorized persons to enter the building. Anderson does not recall ever being told that. He states that he did not recognize defendants Rodriguez and Deliu but thought they were possibly tenants or construction workers.

After entering, defendants Rodriguez and Deliu walked up the stairs to the Kazanoffs' apartment. According to Deliu, they rang the doorbell, but no one answered. They rang again after a couple of minutes. Subsequently, Shelley Kazanoff opened the door with the chain in place, dressed in a nightgown. Rodriguez identified himself and told her that he needed to talk to her, claiming that his mother Elsie had just died and his brother was in prison. She told them to wait and closed her apartment door. After dressing, she reappeared five to ten minutes later. During that time, she made two telephone calls, including one to Elsie Rodriguez. Then, she stepped into the hallway and turned around to lock the door with her keys in hand. The parties dispute whether she left the apartment to talk to Rodriguez or to go outside, possibly to escape from them. The locks on the door functioned properly. Rodriguez and Deliu grabbed her keys from her and forced her into the apartment. While Deliu rummaged through her bedroom, Rodriguez brutally killed her. They took various items which they subsequently sold for $475. Rodriguez was convicted of murder and burglary in New. York State Supreme Court. In a separate trial, Deliu was acquitted, despite his confession.

Plaintiff returned to the building at approximately 1:00 p.m., using his key to open the locked vestibule door to enter the lobby. He testified at Deliu's criminal trial that one cannot get into the building without a key. Both the lock on the interior set of doors and the buzzer intercom system were functioning properly on that day.

In the 26 years plaintiff resided in the building, he was unaware of anyone being assaulted in the building prior to this incident. The building superintendent testified at his deposition that he had heard of three other burglaries in the building not involving forcible entry, but he did not know whether they occurred before or after the incident involving plaintiff's wife. Plaintiff also claims that a "homeless" man had been seen eating and apparently residing in the basement of the premises on several occasions.

Defendant 100–10 67th Road Condominium Association (the "Association") owned the building in which plaintiff and his decedent resided. Defendant Just Management Corp. ("JMC") was the managing agent of the building since January 1, 1985, pursuant to a written contract entered into with the Association. The contract limits JMC's right to perform repairs or alterations to the building in excess of $1,000 without the condominium board's approval. Defendant Preferred 100–10 67th Road Condominium Corp. ("Preferred") owned the unsold apartments in the building, including apartment 2J which it leased to the plaintiff.

## DISCUSSION

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment if it determines that there is "no genuine issue as to any material fact" and that the "moving party is entitled to judgment as a matter of law." A party moving for summary judgment has the burden of proving that no genuine issue of material fact exists. Rule 56(e) provides that a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading but ... must set forth specific facts showing that there is a genuine issue for trial."

Summary judgment is appropriate when, after adequate time for discovery, a party

having the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Here, plaintiff's cause of action is based upon negligence. "In order to prove a prima facie case of negligence, a plaintiff must establish: (1) the existence of a duty on the part of the defendant to the plaintiff, (2) a breach of that duty, and (3) injury suffered by the plaintiff as a result of the breach [proximate cause]." *Iannelli v. Powers*, 498 N.Y.S.2d 377, 380, 114 A.D.2d 157, (2d Dep't 1986). Thus, to obtain summary judgment, defendant must demonstrate that plaintiff has presented no basis on which he could prove at least one of these elements.

In support of its motion for summary judgment, the government claims that it owed no legally cognizable duty to the plaintiff. Alternatively, the government claims that, even if it owed plaintiff a duty and breached that duty, the criminal acts of defendants Deliu and Rodriguez were unforeseeable and therefore constitute a superseding cause of injury.

To sustain this negligence tort action against the government, the plaintiff must establish that the government, in the person of its postal employee, owed the plaintiff a legally cognizable duty, the breach of which is a proximate cause of the plaintiff's injury. In the absence of such a duty, any claim for negligence must fail. Where the undisputed material facts do not establish the existence of a duty, summary judgment is appropriate.

The government contends that it had no duty to protect plaintiff's decedent from the acts of third parties. It argues that New York courts have recognized that, where injury was inflicted by the independent, intervening act of a third party, "[t]here will ordinarily be no duty thrust on a defendant to prevent a third party from causing harm to another." *Einhorn v. Seeley*, 525 N.Y.S.2d 212, 215, 136 A.D.2d 122 (1st Dep't 1988).

In *Einhorn*, plaintiff sued the landlord and a locksmith for negligence after she was assaulted and then raped by a stranger in her fiancé's apartment. She claimed that the locksmith had been negligent in not properly repairing the lock in the building lobby. The First Department granted summary judgment to the locksmith, holding that, where "the act complained of ... was perpetrated by an intervening person," no duty would be imposed upon the defendant to prevent that harm. *Id.* at 215. The court recognized that, although some cases imposed a duty on the owner/occupier of the premises to prevent criminal acts, such an exception only applied where some special relationship existed.

The government argues that in this case, where the letter carrier was a stranger to the attackers and there was no special relationship between the letter carrier and the Kazanoffs, it had no legally cognizable duty to protect the plaintiff or his wife from the acts of defendants Rodriguez and Deliu.

Plaintiff responds that, because Anderson, a United States postal employee, was given a key, he was not a mere "delivery man." Thus, plaintiff argues that Anderson was placed in a special relationship with the tenants and had a duty to them not to allow unauthorized persons to enter the building through the single locked door. However, the fact that the postman was given a key by the condominium did not create the kind of special relationship between tenants and the postman referred to in *Einhorn*.

A second New York State case deals with the question of the nature of the special relationship sufficient to establish a duty of care. *Donohue v. Copiague Union Free School District*, 407 N.Y.S.2d 874, 877, 64 A.D.2d 29 (2d Dep't 1978), sets

out several factors that determine whether a duty exists. Those factors are:

"Moral considerations arising from the view of society towards the relationship of the parties ... preventative considerations which involve the ability of the defendant to adopt practical means of preventing injury.... economic considerations, which include the ability of the defendant to respond in damages; and administrative considerations, which concern the ability of the courts to cope with a flood of new litigation."

*Id.* at 877. "Moral considerations" argue against the recognition of any special relationship here. In essence, the postman, given a key for the mutual benefit of himself and the tenants, is in no different position than numerous other persons whose regular coming and going may justify giving them a key to avoid the necessity of having a tenant open the door each time they appear. Newspaper deliverers, workmen, and others fall within this category as easily as post office employees, and the decision to give the key rests on prudential give-and-take in which the risks can be considered by all involved.

In analyzing "preventative considerations," criminals can, of course, be prevented from entering a building if everyone who enters or leaves that building is careful not to allow any strangers to enter as they open the door. However, as a practical matter, shutting a door in a person's face may be a difficult thing to do. Doing so cuts against general norms of politeness and can even invite its own form of disorder. Common sense dictates that an unknown person may slip in to do injury, but exercising common sense is different than carrying out a duty of care. Training postmen how to deal with such situations would pose large administrative costs and, in the end, deal with only one of many possibilities for law breakers to enter a building to do injury.

Economically, the government can afford to pay damages in any particular case, but public policy may warrant avoiding a rule of law which would make the government respond to injuries of the sort involved here. Finding a duty in this case might well require imposing a duty on any person authorized to enter a building not to allow strangers into the building. Other individuals could not necessarily respond in damages. Every tenant would be exposed to new potential liability to the other occupants of the building.

Administrative considerations also argue against a duty here. Creating a duty of care, here, would result in a significant increase in litigation if the duty was imposed on anyone given a key because of a regular need to enter this City's many multi-dwelling buildings.

Given the ruling in *Einhorn* and the policy considerations set out in *Donohue,* I conclude that no duty existed on the part of the defendant government to keep strangers from entering a vestibule while defendant's employee was leaving it. Given *Donohue*'s "preventive considerations," even though there may be a duty of care not to make illegal entry inviting (for example, by propping open the door) or especially easy, nothing in the facts of this case indicates any such thing occurred here. Since no reasonable jury could believe that any duty of care which might have existed was breached in this case, summary judgment is appropriately granted in favor of the defendant federal government.[1]

■ Accepting plaintiff's version of the facts as true, plaintiff has also failed as a matter of law to establish negligence on the part of defendants 100–10 67th Road Condominium Association, JMC, and Preferred. Plaintiff has made no showing

---

**1.** The government also argues that, even if a duty of care existed, the intervening criminal conduct constituted a superseding cause of the plaintiff's injuries and thus relieves the government of liability. Because I find no breach of duty, there is no reason to address this issue. However, I note that in its recent opinion in *Maysonet v. KFC, National Management Co.,* 906

F.2d 929, 930 (2d Cir.1990), the Second Circuit held that "intervening criminal acts" do constitute a superseding cause of injury unless the defendant has specific warning that such acts may occur in the specific case. Here, the letter carrier had no warning that Rodriguez and Deliu were about to commit a crime.

from which a rational trier of fact could conclude that any of these defendants acted unreasonably or failed to satisfy any duty owed the plaintiff's decedent.

Section 50–a of New York's Multiple Dwelling Law defines the minimal security required by law to be maintained in a Class A Multiple Dwelling such as 100–10 67th Road. Subdivision 3 provides that such dwelling "shall be equipped with automatic self closing and self locking doors ... and with the intercommunication system described in Paragraph '2' of this section," provided a majority of the tenants so request or consent. It is undisputed that the building satisfied that standard on the date of the incident. The building was equipped with an intercom system and a locked door separating the vestibule and lobby areas. The locked door prevented the individual defendants from gaining access to the building. According to defendant Deliu, it prevented them from entering even when defendant Rodriguez tried to jimmy it open. They only gained access when the mail carrier opened the door to leave the building.

Plaintiff acknowledges that the Multiple Dwelling Law was not violated but argues that defendants' duties were not satisfied by mere compliance with the statutory minimum. Plaintiff repeats without elaboration the allegation in the complaint that defendants "failed to properly manage the building by failing to provide necessary security for the tenants."

Under New York law, "[a] person who possesses realty as either an owner or a tenant is under a duty to exercise reasonable care under the circumstances to maintain the property in a safe condition. That duty includes an obligation to take minimal precautions to protect members of the public from the reasonably foreseeable criminal acts of third persons." *Iannelli v. Powers*, 498 N.Y.S.2d 377, 380, 114 A.D.2d 157 (2d Dep't 1986) (citations omitted). However, the possessor of realty is not an insurer of the safety of its tenants or visitors. "Thus, even where there is an extensive history of criminal conduct on the premises, the possessor cannot be held to a duty to take protective measures unless it is shown that he either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons ... which is likely to endanger the safety of the visitor." *Nallan v. Helmsley–Spear*, 407 N.E.2d 451, 429 N.Y.S.2d 606, 613, 50 N.Y.2d 507 (1980) (quoting Restatement, Torts 2d, § 344, Comment *f*); *see also Maysonet, supra*, in which the Second Circuit explicitly endorsed the *Nallan* standard.

In *Nallan*, the New York Court of Appeals concluded that the proof of foreseeable criminal conduct was sufficient to send the question of defendants' liability to the jury where plaintiff had introduced evidence that there had been 107 reported crimes in the defendants' office building in the 21 months preceding the shooting of plaintiff. 429 N.Y.S.2d at 613–14. However, in *Iannelli*, the Second Department reversed a jury verdict for the plaintiff because he had not established a prima facie case of negligence. The court found, as a matter of law, no liability where a visitor to an office building was shot by robbers leaving an office. Here there was no evidence of foreseeability because there was little evidence of prior criminal activity.

Defendants contend that the criminal conduct in this case could not, as a matter of law, have been reasonably foreseeable. There is no evidence of criminal activity in the building resulting in physical harm to any resident prior to the date of this incident. Plaintiff himself has lived in the building for 26 years and is not aware of anyone being physically assaulted there.

Plaintiff argues that a history of criminal acts did exist. However, he relies only on the deposition of the building's superintendent, who testified that he had heard of three burglaries not involving forcible entry into the building but of no other crime. Moreover, the superintendent also stated that he did not know whether any of the burglaries preceded the incident involved in this case. Furthermore, he had no personal knowledge of these burglaries but had been told of them by others. Rule 56(e)

**1062**

requires affidavits from personal knowledge. Here, Dabovic had no such personal knowledge of the other incidents. This scant, second-hand evidence does not constitute a showing that defendants had a duty to provide greater security measures.

The question of what constitutes "reasonable care" is generally a question to be decided by the trier of fact. However, in this case there is no set of circumstances under which a rational finder of fact could find defendants' conduct "unreasonable." Defendants have complied with the relevant statute, which constitutes some evidence of what is reasonable. Plaintiff does not present any first-hand evidence suggesting a need for more than these normal precautions.

To withstand a motion for summary judgment, plaintiff has a duty to present affidavits or evidence demonstrating that a genuine issue of material fact exists. The undisputed facts demonstrate that the lock was functioning and that it in fact kept Rodriguez and Deliu from entering freely or with a credit card. Defendants Rodriguez and Deliu entered the building when the mail carrier opened the door and entered plaintiff's apartment only after his decedent stepped outside into the hall. Plaintiff has not presented any affidavit or other evidence that demonstrates what type of security measures he claims were required. Thus, defendants cannot rebut plaintiff's vague allegation, except by showing that they complied with the law and that the security measures it provided functioned properly. Plaintiff has failed to present any evidence that defendants had a duty to provide greater measures of security or to identify such security measures. Thus, there is no genuine issue of material fact as to this essential element.

Accordingly, defendants Association, JMC and Preferred are entitled to summary judgment dismissing the complaints and cross claims.[2]

For the foregoing reasons, the motions of the defendants United States of America, 100–10 67th Road Condominium Association, Preferred 100–10 67th Road Condominium Corporation, and Just Management Corp. are granted. Plaintiff is directed to inform the Court within twenty days of the date hereof whether he intends to proceed with this case as to the individual defendants.

SO ORDERED.

2. Defendant Preferred argues that, as owner of the unsold apartment units in the building, including plaintiff's, it did not maintain control over the premises where the incident occurred and thus had no duty to provide security in common areas of the building. This issue need not be reached. However, it is noteworthy that control is an essential element in determining responsibility in tort of an owner of real property for injuries that occur on the property. There is no evidence that Preferred, as an out-of-possession lessor of the unsold apartment units, exercised control over the premises. Moreover, where a tenant has taken possession and is in exclusive control of the premises or that portion of the property where the injury occurred, a landlord is not ordinarily liable for injuries sustained as a result of a defective condition of the premises, absent a statute. *See Schlesinger v. Rockefeller Center Inc.,* 500 N.Y. S.2d 510, 119 A.D.2d 462 (1st Dep't 1986).